IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHANDLER TODD BARR,

     Plaintiff,

v.                                                                     No.   12-CV-01109-GBW/RHS

CITY OF ALBUQUERQUE,
RAY SCHULTZ, in his official capacity,
LEAH KELLY, in her individual capacity,
JENNIFER JARA, in her individual capacity,
and ANDREA ORTIZ, in her individual capacity,

     Defendants.

## ORDER

     This matter is before the Court on the Defendants' motions for summary

judgment (*docs. 59, 64, 86*) and their motion to dismiss Plaintiff's complaint on the basis

of Plaintiff's alleged discovery violations (*doc. 89*).   Having reviewed the accompanying

briefing and considered the parties' oral argument (*doc. 117*), and being fully advised,

the Court will GRANT Defendant Ortiz's Motion for Summary Judgment, GRANT in

part and DENY in part Defendants Kelly and Jara's Motion for Summary Judgment,

GRANT in part and DENY in party Defendants City of Albuquerque (City) and

Schultz's Motion for Summary Judgment, and DENY Defendants' Motion to Dismiss.

# I.    BACKGROUND

Plaintiff Chandler Barr is a 23-year-old man with a long history of serious mental illness.  *Doc. 52* ¶¶ 12, 15-16.   On September 11, 2010, Plaintiff was traveling by Greyhound bus from Oklahoma to Oregon when, while passing through Albuquerque, he began to feel ill.  *Id.* ¶ 17-18. He exited the bus and contacted the Albuquerque Police Department (APD), informing them that he was having suicidal thoughts. *Id.* ¶ 19. APD officers and emergency medical personnel responded to the scene, at which point Plaintiff informed them that he was hearing voices in his head.  *Id.* ¶¶ 20-21.  Plaintiff was taken to the University of New Mexico Medical Center (UNMMC) where he received treatment for a broken finger; he was then transferred to the University of New Mexico Psychiatric Center (UNMPC) where he was treated for three days and released on September 13, 2010.  *Id.* ¶¶ 22-25.

On September 14, 2010 at approximately 7:50 a.m., Plaintiff returned to the Greyhound bus station and approached Ryan Trujillo, a Greyhound employee, about changing his bus ticket because of his hospitalization.  *Id.* ¶¶ 28-29.  After Mr. Trujillo informed him about how he could change his ticket, Plaintiff left the bus station, but returned ten minutes later carrying a butter knife.  *Id.* ¶¶ 30-33.  Staff at the station noticed that Plaintiff had blood on his left arm and approached Plaintiff, who rebuffed them and again left the bus station.  *Id.* ¶¶ 34-35, 37.  After Plaintiff left the station for the second time, Mr. Trujillo called the police and then he and Jaime Mason, a bus

station security guard, followed Plaintiff as he walked north down 1st Street towards

Central Avenue. *Id.* ¶¶ 38-40.

At approximately 8:17 a.m., Defendants Jara and Kelly arrived at the scene,

where they found Plaintiff walking down 2nd Street, bleeding from self-inflicted wounds

on his forearm, with the knife visible in his hand. *Id.* ¶¶ 45-49, 63. Defendants Jara and

Kelly had been notified by dispatch that Plaintiff was behaving in a way that indicated

psychological issues. *Id.* ¶ 44. Defendants Jara and Kelly parked their vehicles near the

intersection of Central Avenue and 2nd Street, at which point Defendant Kelly exited her

vehicle and positioned herself behind the driver's side door of her vehicle with her

sidearm drawn. *Id.* ¶¶ 52, 53, 57. Defendant Kelly directed Plaintiff to stop moving

and put down the knife, at which point Plaintiff began to move towards Defendants

Kelly. *Id.* ¶¶ 57, 59-61. As Plaintiff began to move towards Defendant Kelly,

Defendant Jara arrived on the scene. *Doc. 64*, Ex. N at 114:9-12. As Defendant Jara was

exiting her car, Defendant Kelly shot Plaintiff twice, at which point Plaintiff collapsed.

*Doc. 52.* ¶¶ 65, 68-69, *doc. 64*, Ex. N at 114:13-14. Defendants Kelly and Jara then

approached Plaintiff and ordered him to turn on his stomach. *Doc. 52* ¶¶ 72-73.

Defendant Jara used her boot to assist Plaintiff in turning onto his stomach, and then

handcuffed him. *Id.* ¶ 75. Plaintiff was hospitalized for 31 days at the University of

New Mexico Hospital before being transferred to the Bernalillo Metropolitan County

Detention Center and finally back to the Northwest Center for Behavioral Health in Oklahoma. *Id.* ¶¶ 86-87

 Defendant Ortiz was called to the scene to investigate the shooting. *Id.* ¶ 78. Based on her investigation, she produced a supplementary police report indicating that Plaintiff had assaulted Defendants Kelly and Jara in violation of state law. *Id.* ¶¶ 79-80. Defendant Ortiz also completed a criminal complaint and arrest warrant for Plaintiff regarding the assault. *Id.* On November 5, 2010, after hearing testimony from Defendant Ortiz, the sole witness, a grand jury indicted Plaintiff for aggravated assault on a police officer with a deadly weapon in violation of N.M.S.A. 1978 § 30-22-22(A), a third degree felony. *Id.* ¶¶ 91-92.

 On February 13, 2012, Plaintiff moved to dismiss the indictment on the basis that the grand jury had not been instructed that Plaintiff had to have been aware that the intended assault victim was a police officer. *Id.* ¶ 95. The court dismissed the indictment without prejudice on March 20, 2012. *Id.* ¶ 97.

 Plaintiff's operative Complaint (*doc. 52*) raises eight claims: battery, false arrest, and malicious prosecution in violation of New Mexico law, as well as excessive force, wrongful arrest, malicious prosecution, supervisory and municipal liability under 42 U.S.C. § 1983.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires that a party seeking summary

judgment demonstrate that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In our circuit,

the moving party carries the burden of showing beyond a reasonable doubt that it is

entitled to summary judgment."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979

(10th Cir. 2002) (quoting *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991))

(internal quotations omitted).

Summary judgment is proper only if a reasonable trier of fact could not return a

verdict for the nonmoving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

movant bears the initial burden of "show[ing] that there is an absence of evidence to

support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d

887, 891 (10th Cir. 1991) (citing *Celotex*, 477 U.S. at 323).  Once the movant meets this

burden, Rule 56(e) requires the non-moving party to designate specific facts showing

that "there are . . . genuine factual issues that properly can be resolved only by a finder

of fact because they may reasonably be resolved in favor of either party."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.  "An issue is

'genuine' if there is sufficient evidence on each side so that a rational trier of fact could

resolve the issue either way.  An issue of fact is 'material' if under the substantive law it

is essential to the proper disposition of the claim."  *Thom v. Bristol Myers Squibb Co.*, 353

F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).

The court must adhere to three principles when evaluating a motion for summary judgment.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  *See Liberty Lobby*, 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 551–54 (1999).  Third, the court cannot decide any issues of credibility.  *See Liberty Lobby*, 477 U.S. at 255.  However, if the non-moving party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In the end, "to survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor."  *Id*. at 257.

### III.   UNDISPUTED FACTS

**THE EVENTS OF SEPTEMBER 14, 2010**

1.  On September 14, 2010 at approximately 7:50 a.m., Plaintiff entered the
    Greyhound Bus Station located at 320 1st Street Southwest in downtown
    Albuquerque and approached Ryan Trujillo, an employee of Greyhound about
    changing his bus ticket.  *Doc. 59*, Ex. 1 at 3; *doc.* 64, Ex. A at 250:3-6.

2.  At the time that Plaintiff approached Ryan Trujillo, another Greyhound
    employee, Dwayne Sawyer, observed and reported to Mr. Trujillo that Plaintiff
    appeared to be bleeding.  *Doc. 59*, Ex. 1 at 3-4.

3.  Plaintiff exited the bus station and Mr. Trujillo called 9-1-1 for assistance and
    then followed him out.  After Mr. Trujillo exited the station, he observed that
    Plaintiff had a butter knife in his hand and that he appeared to be bleeding from
    cuts on his arm.  *Doc. 59*, Ex. 1 at 3-6; *doc. 64*, Ex. A at 252:4-5; *doc. 74*, Ex. 1; *doc.
    84*, Ex. R.

4.  Mr. Trujillo continued to follow Plaintiff, during which time he observed Plaintiff
    attempting cut himself again with the knife.  *Doc. 59*, Ex. 1 at 6; *doc. 64*, Ex. A at
    252:16-20.

5.  Defendants Jara and Kelly, both APD officers, were dispatched to the scene in
    response to the 9-1-1 call.  *Doc. 64*, Ex. D at 67:13-25.

6. Mr. Trujillo observed Defendants Jara and Kelly arrive at the scene in marked patrol vehicles. *Doc. 59*, Ex. A at 9; *doc. 74*, Ex. 3 at 21:4-7, Ex. 6 at 18:1-3. When Defendants Jara and Kelly arrived at the scene, they exited their vehicles. *Doc. 64*, Ex. B at 39:19-40:14.

7. After Defendant Kelly exited her vehicle, she observed that Plaintiff had a knife in his possession and that he was attempting to cut himself with it. *Doc. 64*, Ex. D at 68:16-20. She also observed that Plaintiff was walking around in a "tense," "rigid" manner. *Id.* at 68:22-23, 97:4-9.

8. Defendant Kelly then ordered Plaintiff several times to "drop the knife." *Doc. 59*, Ex. A at 9; *doc. 64*, Ex. A at 282:1-7, Ex. D at 69:12-13. Plaintiff did not comply with Defendant Kelly's order and continued to move towards Defendant Kelly. *Doc. 59*, Ex. A at 9-10; *doc. 64*, Ex. A at 282:8-11; *doc. 74*, Ex. 3 at 21:16-18.

9. As Plaintiff moved towards Defendant Kelly, Defendant Jara arrived on the scene. *Doc. 64*, Ex. N at 114:9-12.

10. As Defendant Jara exited her vehicle, Defendant Kelly then shot Plaintiff twice from a distance of approximately twenty-one feet. *Doc. 64*, Ex. A at 282:18-19, Ex. D at 69:23-24, Ex. N at 114:11-12; Ex. P; *doc. 74*, Ex. 3 at 21:18-19.

11. After Defendant Kelly shot Plaintiff, Plaintiff collapsed on the ground and Defendant Jara approached Plaintiff and asked him to roll onto his stomach in order to handcuff him. *Doc. 64*, Ex. N at 130:23-3. At the time that she

approached him, she was unsure whether Plaintiff had any other weapons in his

possession and she had not had an opportunity to search Plaintiff. *Id.* at 135:21-

24, 143:18-23.

12. Defendant Jara, with the assistance of a security guard, turned Plaintiff over on

his stomach and handcuffed him. *Id.* at 145:1-15.

13. The day after the shooting, APD Chief Ray Schultz gave a statement to news

station KRQE in which he stated "You can't rationalize with them [mentally

disturbed people] in many cases, and if you do get to the point where you are

using a less-lethal force option, it's not effective." *Doc. 99* at 131:18-132:3, 133:18-

134:14.

**THE INVESTIGATION OF THE EVENTS OF SEPTEMBER 14, 2010**

14. Because the shooting involved police officers, a multijurisdictional shoot team

was assigned to investigate the incident. *Doc. 99* at 60:3-9. Defendant Andrea

Ortiz of the APD was assigned to investigate Plaintiff's shooting. *Id.* at 60:22-25.

Both a criminal and an internal investigation were conducted, with the criminal

investigation incorporated into the internal investigation. *Id.* at 156:5-13.

15.  As part of her investigation, Defendant Ortiz interviewed Mr. Trujillo on

September 14, 2010. *Doc. 59*, Ex. B. During the interview, Mr. Trujillo stated that

after Defendant Kelly told Plaintiff to stop moving, "[Plaintiff] didn't stop. He

ignored their warnings. Then he immediately turned his attention to Officer

Kelly and left the sidewalk.  Took about three to four steps towards Officer Kelly.
. . both of those officers both again told him to stop. He didn't stop.  At that time
Officer Kelly discharged her weapon twice . . . ." *Id.* at 9-10.  He also stated that
as Plaintiff moved towards Officer Kelly he "had raised the knife up to I'd say
about mid-torso level. . .[and the knife] was slightly angled towards her in her
direction."  *Id.* at 12.

16. On September 14, 2010, after interviewing Mr. Trujillo, Defendant Ortiz swore an
    arrest warrant affidavit in order to charge Plaintiff with aggravated assault upon
    a police officer and assault with intent to commit a felony.  *Doc. 59*, Ex. C.  In her
    affidavit Defendant Ortiz quoted Mr. Trujillo as saying "the suspected raised his
    right arm and pointed it directly at Officer Kelly" and that Plaintiff walked
    towards Officer Kelly in " 'an aggressive manner' ." *Id.*

17. On September 14, 2010, a judge of the Metropolitan Court for the State of New
    Mexico issued an arrest warrant against Plaintiff for aggravated assault upon a
    police officer and assault with intent to commit a felony.  *Doc. 59*, Ex. E.

18. Defendant Ortiz interviewed Defendant Kelly about the shooting on September
    15, 2010.  *Doc. 99*, Ex. 15.

19. On November 5, 2010, Defendant Ortiz testified before a grand jury in relation to
    the charges levied against Plaintiff, and the grand jury indicted Plaintiff on the
    charge of aggravated assault on a peace officer.  *Doc. 59*, Ex. G.  In her grand jury

testimony she stated that Mr. Trujillo had told her that Plaintiff was walking "at a higher rate in an aggressive manner" with "his arms bowed out with the knife" when Plaintiff approached Defendant Kelly. *Id.* at 9:6-11, 14:11-14.

20. On November 8, 2010, Plaintiff was arrested for aggravated assault on a peace officer. *Doc. 59*, Ex. H.

21. Plaintiff was arraigned on this charge on November 22, 2010 and released on bond. *Doc. 59*, Exs. I, J.

22. On January 21, 2011, Defendant Ortiz filed a supplemental police report about the incident detailing the findings of her investigation including interviews with multiple witnesses at the scene of the incident. *Doc. 59*, Ex. D.

23. On December 9, 2011, Plaintiff filed a Motion to Dismiss the Grand Jury Indictment. *Doc. 59*, Ex. K.

24. On March 30, 2012, the Honorable Reed Sheppard of the Second Judicial District Court dismissed the charges against Plaintiff. *Doc. 59*, Ex. K.

25. The APD's Internal Affairs Unit conducted an investigation of Plaintiff's shooting, the result of which was to find that Defendant Kelly was justified in shooting Plaintiff. *Doc. 99*, Ex. 1 at 16:14-17, 53:25-54:5, Ex. 11 at 2.

26. On June 10, 2013, Plaintiff deposed Mr. Trujillo. During that deposition, Mr. Trujillo stated that her had never told Defendant Ortiz that Plaintiff advanced on Defendant Kelly in an aggressive manner. *Doc. 74*, Ex. 3 at 87:20-88:1.

**TRAINING OF DEFENDANTS KELLY AND JARA**

27. Both Defendants Jara and Kelly received 904 hours of training, including training on crisis intervention and the use of force, during their tenure at the APD Cadet Academy. *Doc. 86*, Exs. G, H.

28. APD standard operating procedures (SOP) 2-13 requires that officers dealing with individuals appearing to present with a mental health crisis attempt to de-escalate the situation if possible and determine whether an emergency mental health evaluation is necessary. *Doc. 98*, Ex. 9 ¶ 25, Ex. 14.

29. APD SOP 2-52 addresses the use of force and explains that "where force is warranted, officers should assess the incident in order to determine which technique or weapon will reasonably de-escalate the situation" and that the use of deadly force is authorized to "protect the officer or others from what is reasonably believed to be an immediate threat of death or serious injury." *Doc. 86,* Ex. B.

30. APD SOP 2-52 further requires that all incidents in which police actions result in death or great bodily harm must be investigated per Section 3-41 of the Administrative Orders. The use of deadly force must also be reported to the officer's supervisor, who must generate a written report within 72 hours of the incident. *Id.* Deadly force incidents require both a criminal and administrative investigation, with the Internal Affairs Unit evaluating whether the incident

12

involved a violation of APD rules or policies, whether the policy relevant to the

situation was adequate, and whether the training the officer had received

relevant to the incident was also adequate. *Id.*

31. Officers deviating from the SOPs are subject to discipline.  *Doc. 98*, Ex. 9 ¶ 25.

32. APD officers are required by both verbal and written APD policy to attend two

semi-annual in-house days of training called maintenance of effort (MOE)

training.  *Doc. 86* Ex. I.  These MOEs must annually include use of force training

and triennially include mental illness training.  *Id.*  In 2009, these trainings

included training on the use of force and role-playing of scenarios requiring the

de-escalation of encounters with mentally ill individuals.  *Doc. 98*, Ex. 9 ¶¶ 16-20.

Officers face significant discipline for failure to attend. *Id.*

33. Defendant Jara testified she had received crisis intervention (CIT) training,

including how to deal with suicidal individuals.  *Doc. 74*, Ex. 10 at 64:15-24.

## APD POLICIES AND PROCEDURES

34. APD Administrative Order 3-14 sets forth the policy governing the Internal

Affairs Unit of the APD, which is "to investigate allegations of misconduct by

Department personnel."  *Doc. 86*, Ex. N.  This Unit is required to investigate all

discharges of a firearm by sworn personnel.  *Id.*

35. APD Administrative Order 3-49 sets forth the Early Warning System (EWS) for

the APD.  *Doc. 86*, Ex. M. The stated purpose of the EWS is to "identify

employees who have shown a propensity for involvement in incidents of potential misconduct," including use of force incidents, internal investigations, and firearm discharge. *Id.* If an employee has more than 5 EWS entries, a face-to-face meeting is conducted with the employee and the Internal Affairs Unit is notified of the outcome of the meeting. *Id.*

36. City of Albuquerque Ordinance § 9-4-1-2 establishes the Police Oversight Commission, which provides oversight of investigations of citizen complaints against the APD. *Doc. 86*, Ex. O.

**APD INCIDENCES OF USES OF DEADLY FORCE 2006-2011**

37. The rate of deadly force encounters by the APD with the public in 2010 was unusually high. *Doc. 98*, Ex. 6; *doc. 99*, Ex. 1 at 200:22-201:3.

38. In late 2010, the APD commissioned the Police Executive Research Forum (PERF) to conduct a study on the use of force, including deadly force, by the APD because of the number of deadly force encounters the APD experienced in 2010. *Doc. 98*, Ex. 4 at 52:21-53:10, Ex. 7 at 117:20-118:1. On June 23, 2011, PERF issued a report on the use of force by the APD for the years 2006-2010. *Doc. 98*, Ex. 2. In that time period, the report found that 47 APD officers were involved in 37 shootings that resulted in 18 deaths. *Id.* at 10. Of the people subjected to the use of deadly force, 54% had a confirmed prior history of mental illness. *Id.* at 12.

PERF made 40 recommendations to improve APD policies regarding the use of force.  *Id.*

39. The APD internal investigation into the shooting of Kenneth Ellis exonerated the officers involved in that incident.  *Doc. 99* at 66:9-25.

40. A civil jury found the use of force in the Kenneth Ellis case to be excessive. *Doc. 98*, Ex. 12; *doc. 99* at 67:1-2.

## IV.   DEFENDANTS' MOTION TO DISMISS

At issue in this motion is whether Plaintiff was deliberately deceptive in two regards: (1) failing to report his statement with regard to Officer Kelly "I do see grounds for her Behavior, because I was Charging her," posted from his YouTube account, in response to Defendants' Interrogatory 6 and Request for Production 10, and (2) during his deposition when recounting whether he believed he had "charged" Defendant Kelly.  *See doc. 89*.  Defendants request dismissal of Plaintiff's complaint, or in the alternative, they request that the fact that Plaintiff charged Defendant Kelly be deemed admitted, as the sanction for this deception.

During the oral argument on this Motion, Plaintiff's counsel explained that she believed that the failure to disclose the posting was her error:  "I [Plaintiff's attorney] simply never asked him if he had a YouTube account . . . . it never occurred to him to mention it, and I don't even think that he remembered that he had made that post . . . So I don't think there was any intent to conceal on his part, certainly, and a failure to

discover is my fault." *Doc. 117*, 4:19-5:7.  Plaintiff further notes that the existence of the

account and comment were ultimately disclosed to Defendants.  *Id.* at 6:5-19.  As to

Plaintiff's apparent deceptiveness at his deposition, Plaintiff contends that he only used

the word "charged" after having the event recounted to him using that word, not in his

original version of the event to his physicians and police.  *Id.* at 5:22-6:3.

As noted at the hearing, the Court is unpersuaded that either of Defendants'

requested sanctions are appropriate under the circumstances.  However, should the

case proceed to trial, the court will consider giving a jury instruction which advises the

jury that they may make inferences against Plaintiff for failure to properly respond to

discovery requests and/or deposition answers.  *Id.*  at 18:17-20:4.  Thus, Defendants'

motion to dismiss will be denied without prejudice to seek a lesser sanction in the form

of a jury instruction at trial.

## V.    PLAINTIFF'S FEDERAL CLAIMS

Plaintiff brings five federal claims, against which each of the relevant Defendants

move for summary judgment.  In Count IV, he contends that Defendants Kelly and Jara

used excessive force when Kelly shot Plaintiff and Jara failed to stop her from doing so.

In Count V against Defendant Ortiz only, and Count VI against both Defendants Ortiz

and Kelly, Plaintiff argues that he was wrongfully arrested and maliciously prosecuted

for assault on a police officer.  In Counts VII and VIII, Plaintiff seeks to hold Defendants

Schultz and City liable for the actions of Defendants Kelly, Jara, and Ortiz.

16

Defendants Kelly, Jara, and Ortiz assert that they have qualified immunity for all their actions.  Defendant Schultz argues that Count VII should be dismissed because, as he is sued in his official capacity only, it is identical to Count VIII, and also that it fails because Plaintiff has not demonstrated a link between Defendant Schultz and Defendants Kelly, Jara, and Ortiz's conduct.  Defendant City, for its part, maintains that Plaintiff has failed to demonstrate that *Monell* liability exists here and it is entitled to summary judgment on that basis.

### A. Qualified immunity standard

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff who must clear two hurdles to defeat the defendant's motion.  The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity."  *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (citations omitted). "A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right . . . ."  *Id.*  Courts have discretion to decide "which of

17

the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

### B.   Plaintiff's § 1983 Excessive Force Claim (Count IV)

Plaintiff contends that when Defendant Kelly shot him, she subjected him to excessive force in violation of his constitutional rights.  He further contends that Defendant Jara contributed to the violation of those rights when she failed to stop Defendant Kelly.  Finally, Plaintiff also alleges that the Defendant Officers used excessive force when handcuffing Plaintiff after they shot him.

The Fourth Amendment of the United States Constitution protects individuals against the use of excessive force, including deadly force, in the context of a seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  A seizure occurs for the purposes of the Fourth Amendment when a police officer makes a show of authority or applies force to an individual, thereby terminating the movement of the individual or causing him to submit to the officer's authority.  *Brooks v. Gaenzle*, 614 F.3d 1213, 1223 (10th Cir. 2010). A police officer uses excessive force during a seizure if his actions were not "objectively reasonable in light of the facts and circumstances confronting [him]." *Graham*, 490 U.S. at 397 (internal quotation marks omitted); *see also Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).

An evaluation of reasonableness requires a fact-specific evaluation of the totality of the circumstances surrounding the event at issue, made from the perspective of "a reasonable officer on the scene," who is "often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97; *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009).  When evaluating the reasonableness of the officer's actions, the Court may consider, among other factors, (1) the severity of the crime in question, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting or attempting to evade arrest.  *Graham*, 490 U.S. at 396.  The Court should also consider "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (citation and internal brackets omitted).  Once the relevant facts are determined with all reasonable inferences drawn in favor of the non-moving party at the summary judgment stage, "whether [the suspect's] actions have risen to a level warranting deadly force . . . is a pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007).  The Tenth Circuit has repeatedly emphasized that this finding must be based on an evaluation of the totality of the circumstances.  *See, e.g., Estate of Larson ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 (10th Cir. 2008); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 395, 699 (10th Cir. 1995).

### 1.     Defendant Kelly's involvement in the shooting

There is no question that when Defendant Kelly shot Plaintiff and Plaintiff

collapsed, Plaintiff was seized for the purposes of the Fourth Amendment.  Therefore,

the Court turns to the (non-exhaustive) factors set forth in *Graham*.  First, the Court

notes that the alleged crime in question is a violent felony: assault on a person/police

officer.  Because the crime at issue is a violent felony, the first factor favors Defendants

Kelly.   The third factor favors Plaintiff, as there was no evidence he was attempted to

evade or resist arrest.

The real issue is whether Defendants Kelly *reasonably* believed that Plaintiff

posed a threat to herself or the public.  *Estate of Larson,* 511 F.3d at 1260 (10th Cir. 2008).

Plaintiff contends that his behavior towards Kelly was obviously nonaggressive,

particularly in light of the fact that he was moving very slowly and held the knife in a

lowered position.  *Doc. 64*, Ex. 1 at 260:3-8.  Kelly points out that it is undisputed that

Plaintiff was carrying a weapon, was bleeding from self-inflicted wounds, failed to

respond to police commands, and in fact approached the police officers while carrying

said weapon.  According to Kelly, he therefore gave the appearance of posing a threat to

the safety of Officers Kelly and Jara, as well as the surrounding witnesses.

Plaintiff's position finds support in Tenth Circuit precedent.   As the Court has

explained, "in assessing the degree of threat facing officers, then, we consider a number

of non-exclusive factors. These include (1) whether the officers ordered the suspect to

drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larson*, 511 F.3d at 1260.  In *Zuchel v. Spinharney*, the Tenth Circuit held that a police officer who shot a suspect who came within 15 feet of him with what the officer believed was a knife arguably used excessive force both because the suspect was not aggressively advancing towards the officer and the 15 foot distance was sufficient to preclude the suspect from being immediately able to injure the officer with the alleged weapon.   890 F.2d 273, 275-276 (10th Cir. 1993).  In *Walker v. City of Orem*, the Court found that the facts supported a claim for excessive force where police shot a man who was standing approximately twenty feet away from them, who had made no threats against the officers, and while armed with a small knife, appeared to be intending to use it on himself.  451 F.3d 1139, 1160 (10th Cir. 2006).  In *Hastings v. Barnes*, the Tenth Circuit again upheld the lower court's denial of summary judgment on an excessive force claim where police officers pepper sprayed a mentally ill man holding a sword because he was neither acting in a verbally nor physically aggressive matter towards the officers at the time.  252 F. App'x 197, 203 (10th Cir. 2007); *see also Hernandez ex. rel. Estate of Medrano*, 2011 WL 1127882 at *17 (D.N.M. March 15, 2011) (holding plaintiff's excessive force claim survived summary judgment because, when the police shot plaintiff, who was armed with a knife and bat "a reasonable jury could find that lethal

force was not an objectively reasonable response to a man who was not armed with projectile weapons, with his arms at his sides, who was twenty feet from the officers, who was in his driveway when the officers were in the street, and who was slowly moving towards the officers."); *cf. Estate of Larsen*, 511 F.3d at 1260 (the officer's use of deadly force was justified in part on the size of the suspect's knife, over a foot long, and because the suspect was holding the knife in an aggressive posture when he first threatened, and then moved towards, the police officers.).

Looking to the facts of this case, while Plaintiff admittedly did not comply with police commands, all other reasonable inferences create a material dispute as to the propriety of the use of deadly force here. Namely, according to Plaintiff's version of events, he neither issued verbal threats, nor physically threatened the officers (or any bystanders) with the weapon—a blunt tipped butter knife -- he was carrying, and he was far enough away (approximately 20 feet) that he could not immediately reach the officers to injure them with his weapon. Even taking into consideration his noncompliance with police commands, Plaintiff has set forth sufficient evidence to create a material dispute as to whether Defendants Kelly reasonably believed he posed a threat when she shot him.

In light of the totality of the circumstances, the Court finds that there is a material dispute of fact as to the appropriateness of the Defendant Kelly's use of force.

According, the Court will deny summary judgment to Defendants Kelly on Count IV as it relates to the shooting of Plaintiff.

### 2.    Defendant Jara's involvement in the shooting

Plaintiff contends that Defendant Jara is equally liable for his injuries related to the shooting because she "failed to prevent Defendant Kelly from using deadly force…." *Doc. 74* at 26-27.  It is true that "a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996).  However, an officer will only be liable "for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, **there must have been a realistic opportunity to intervene to prevent the harm from occurring**." *Hall v. Burke*, 12 Fed. App'x 856, 861 (10th Cir. 2001)(quotation omitted)(emphasis added).  First, Plaintiff fails to explain how Defendant Jara had any duty to intervene *prior* to the shooting of Plaintiff.  At the point Defendant Kelly had her weapon drawn, but before she shot Plaintiff, there was no constitutional violation and therefore no duty on the part of the Defendant Jara. Further, Plaintiff does not argue how it could be it was realistic for Defendant Jara to intervene during the shooting itself, given that Defendant Kelly apparently fired only

twice and in rapid succession.   Because Defendant Jara asserts qualified immunity on this Count, and Plaintiff fails to meet his burden of showing a constitutional violation by Jara for failure to intervene, Defendant Jara is granted summary judgment on this claim.

### 3.   The Handcuffing

Plaintiff also alleges that Defendant Jara used excessive force when she handcuffed Plaintiff after he had been shot.   It is undisputed that, immediately after Defendant Kelly shot Plaintiff, Defendant Jara approached Plaintiff and, with the assistance of a security guard, turned Plaintiff over on his stomach and handcuffed him. *Doc. 64* Ex. A at 284:16-19, Ex. N at 131:14-15, 134:21-135:13, 145:15-21.

The Tenth Circuit has consistently held that the use of some force, including handcuffing, is appropriate towards a suspect where police officers have reasonable concerns for their personal safety.  *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (citing nine Circuits' approval of the use of "intrusive precautionary measures" where the officers can reasonably be concerned for their safety); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030–31 (10th Cir. 1997); *Cortez v. McCauley*, 478 F.3d 1108, 1130 (10th Cir. 2007).  In order "to recover on a[] [handcuffing] excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused

24

by the unreasonable seizure that is not *de minimis*, be it physical or emotional." *Cortez,*

478 F.3d at 1129 n.25.

Defendant Jara did not use more force than was reasonably necessary when she

handcuffed Plaintiff.  Immediately prior to being handcuffed, Plaintiff had been armed

and unresponsive to officer commands, and at least appeared to have attempted to

commit a violent felony against Defendants Jara and Kelly.  Even at the time Plaintiff

was handcuffed, it was unclear whether Plaintiff possessed other weapons and

therefore still posed a threat to Defendants Jara and Kelly.  *Doc. 64* Ex. N at 143:20-23.

The Court's conclusion that a reasonable jury may find the Defendant Kelly used

excessive force when she fired her weapon is based in large part on the distance

between her and Plaintiff and that Plaintiff did not appear to be acting rationally.  After

the shooting, however, the officers must now come in direct physical contact with this

individual who had been in possession of a firearm and had not been acting rationally.

This case can, therefore, be easily distinguished from *Fisher*, on which Plaintiff relies,

both because in *Fisher* the plaintiff had, at best, committed a petty misdemeanor, not a

felony, and by the time that the officers handcuffed that plaintiff, they had already

frisked him and determined that he was no longer armed.  584 F.3d 888, 895 (10th Cir.

2009).  In addition, the plaintiff in *Fisher* had verbally engaged with the police officers

and was generally cooperative with them prior to the handcuffing.  *Id*. Based on a

totality of the circumstances, including the fact that Plaintiff was armed, uncooperative

and uncommunicative, it was reasonable for Defendant Jara to believe that Plaintiff still posed a sufficient threat to her safety, even after being shot, as to warrant handcuffing. Because Defendant Jara's conduct was reasonable, Defendant Kelly accordingly faces no liability on this claim.[1]  The Court will grant Defendants Jara and Kelly's motion for summary judgment as to this claim.

### C.    Plaintiff's § 1983 Wrongful Arrest Claim (Count V)

Plaintiff contends that Defendant Ortiz violated his Fourth and Fourteenth Amendment rights when she arrested him without probable cause for aggravated assault on a police officer based on her own falsified police report and criminal complaint/arrest warrant affidavit.  Defendant Ortiz contends that her interviews with Officers Kelly, Jara, and other witnesses provided a sufficient basis on which to determine she had probable cause that Plaintiff had attempted to assault Officer Kelly when he moved towards her carrying a weapon.

An arrest warrant that is unsupported by probable cause violates the Fourth Amendment.  *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996).  "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (citing FED. R. CRIM. P. 4); *Wong Sun v. United*

---

[1] The grant of summary judgment on this claim as an independent theory of liability, however, does not mean that Plaintiff cannot seek damages that may be associated with the handcuffing.  If a jury were to conclude that Defendant Kelly had used excessive force by shooting Plaintiff, damages associated with being handcuffed immediately after being shot would be recoverable as a consequence of the excessive use of deadly force.

*States*, 371 U.S. 471, 481 n. 9 (1963).  Further, it is a violation of the Fourth Amendment for an arrest warrant affiant to "knowingly, or with reckless disregard for the truth,' include false statements in the affidavit." *Id.* (quotation omitted).   If an arrest warrant affidavit contains false statements, "the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Id.* (quotation omitted).

The elements of aggravated assault on a police officer with a deadly weapon are: (1) that the defendant tried to touch or apply force to a peace officer; (2) that the person subject to the use of force was a peace officer  and was acting as a peace officer; (3) that the defendant knew that the peace officer was a peace officer; (4) that the defendant's conduct threatened the safety of the peace officer; (5) that the defendant acted a rude, insolent, or angry manner; (6) that defendant intended to touch or apply force to the police officer; (7) that the defendant used a deadly weapon.  NM UJI 14-2212.  "Deadly weapon" is defined as including "all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted . . . or any other weapons with which dangerous wounds can be inflicted."  NMSA 1978 § 30-1-12(B).

The false statements Plaintiff alleges Ortiz included in the affidavit are Mr. Trujillo's statements that Plaintiff approached Defendants Kelly and Jara in an "aggressive manner" and that Plaintiff "pointed the knife at them," when in actuality Mr. Trujillo never used the word "aggressive" and stated that the knife was held mid-

torso and angled at Defendant Kelly.  *Doc. 59*, Ex. C, *doc. 74* at 22, Ex. 3 at 87:20-24.

Plaintiff argues that Defendant Ortiz knowingly, or with reckless disregard for the

truth, included those two alleged falsehoods because she knew "an arrest would make

it more difficult for Plaintiff to pursue a civil claim against Defendants."  *Doc. 52* ¶ 153.

However, even if the Court were to excise them from the affidavit, the affidavit

still contains several key undisputed facts.  First, at all relevant times, Plaintiff was in

possession of a knife with which he had been "cutting his wrists."  *Doc. 59*, Ex. C.

Notwithstanding the fact that the knife was a "butter knife," the fact that it was sharp

enough to cut Plaintiff numerous times means that it meets the statutory definition of

deadly weapon. [2]  Second, when the uniformed officers arrived on the scene, they

arrived in marked patrol vehicles.  Third, Plaintiff failed to comply with the instructions

given by the officers.  Fourth, in contravention of their orders, Plaintiff continued to

advance on them while holding his weapon in sight.  This continued advance

establishes at least probable cause that Plaintiff intended to touch or apply force to one

of the officers and thereby threatened their safety.[3]

---

[2]  While not explained in the criminal complaint, the knife's unusual sharpness was apparently the result
of Plaintiff's sharpening it against the sidewalk.  *See doc. 64*, Ex. 1 at 255:13-16; *see also doc. 74*, Ex. A..

[3]  The Court finds no inconsistency between the conclusion that Defendant has not established, as a
matter of law, that the threat from Plaintiff rendered the use of deadly force reasonable and the
conclusion that the affidavit included probable cause that Plaintiff posed some threat to the officers.  In
each case, a different standard applies, a different party has the burden, and the legal context is different.

Because the affidavit, even assuming the excision of the disputed statements, includes probable cause to believe that Plaintiff committed an aggravated assault on a police officer, Defendant Ortiz is entitled to summary judgment on this claim.

### D.   Plaintiff's Malicious Prosecution Claim (Count VI)

Plaintiff next alleges that Defendants Ortiz and Kelly violated his constitutional rights by pursuing charges against him for aggravated assault on a peace officer in the absence of probable cause to support that charge.  *Doc. 52* at ¶¶ 157-165.   A § 1983 malicious prosecution claim attacks the legal process that caused a plaintiff's unconstitutional detention and prosecution and may be premised on either a Fourth or Fourteenth Amendment violation.[4] *See Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008); *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007).  To make out such a claim, a plaintiff must demonstrate five elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."  *Wilkins*, 528 F.3d at 799.

---

[4] "[I]f arrested pursuant to a warrant, plaintiff can challenge the probable cause determination supporting the warrant's issuance" under the Fourth Amendment.  *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008).  But "at some point after arrest, and certainly before the time of trial, [malicious prosecution] analysis shifts to the Due Process Clause" of the Fourteenth Amendment.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1286 (10th Cir. 2004); *see also Mondragon v. Thompson*, 519 F.3d 1078, 1082-83 (10th Cir. 2008); *but see Becker v. Kroll*, 494 F.3d 904, 919 (10th Cir. 2007) (suggesting that malicious prosecution claims based solely on pretrial events must be brought under the Fourth Amendment).  Since neither party has argued that the difference is relevant, it is not necessary here to determine where Fourth Amendment analysis ends and Fourteenth Amendment analysis begins.  *See Pierce*, 359 F.3d at 1286.

### 1.  Defendant Kelly

Plaintiff contends that Defendant Kelly is liable for maliciously prosecuting Plaintiff because she knowingly pursued the prosecution of Plaintiff without probable cause, but he fails to articulate precisely what Defendant Kelly did to cause the prosecution.  Instead, in his Complaint he vaguely alleges that "Defendants Kelly and Ortiz, through each of their respective acts and omissions, caused Chandler's arrest and the charges brought against Chandler, without probable cause, for aggravated assault on a peace officer with a deadly weapon" and that "Defendants Kelly and Ortiz acted with malice in pursuing this prosecution against Plaintiff because they did so knowing that an effective prosecution would make it much more difficult for Plaintiff to pursue a civil claim against Defendants.  Defendants Kelly and Ortiz maliciously pursued these charges so as to limit the possibility or probability of civil remedies against Defendants."  *Doc. 52* ¶¶ 92, 162.  Plaintiff's briefing on summary judgment provides no further clarity – in fact, he never articulates what actions on the part of Defendant Kelly would give rise to such liability.  *See doc. 74* at 18-23.  In the face of Defendant Kelly's assertion of qualified immunity, Plaintiff falls far short of carrying his burden of demonstrating that Defendant Kelly violated his constitutional right against malicious prosecution.  Defendant Kelly is granted qualified immunity on this claim.

### 2.     Defendant Ortiz

Plaintiff contends that Defendant Ortiz maliciously falsified the criminal complaint and her police report detailing the events that led up to the shooting to portray Plaintiff as acting in an antagonistic and potentially violent way towards Defendants Kelly and Jara so that she could support a charge of aggravated assault on a peace officer.  *Doc. 74* at 20.  He claims that she gave similarly false testimony before the grand jury in order to obtain an indictment.  He argues that she was motivated to do so in order to "limit the possibility or probability of civil remedies against Defendants." *Doc. 52* ¶ 163.

As an initial matter, the court notes, as Plaintiff appears to concede, that Plaintiff cannot rely on Defendant Ortiz's grand jury testimony to support a § 1983 malicious prosecution claim because such testimony is protected by absolute immunity.  *See Rehberg v. Paulk*, 132 S. Ct. 1497, 1506 (2012); *see doc. 74* at 20.  Thus, the Court will consider only the claims based on the alleged false information in the complaint and the report.

Under Tenth Circuit law, a § 1983 malicious prosecution claim requires that the plaintiff establish that no probable cause supported the prosecution.  *See Mata v. Anderson*, 685 F. Supp. 2d 1223, 1249 (D.N.M. 2010) *aff'd* 635 F.3d 1250 (10th Cir. 2011). As discussed above in reference to Plaintiff's wrongful arrest claim, even if one removed the alleged misrepresentations with respect to Mr. Trujillo's interview, the

arrest affidavit and Defendant Ortiz's supplemental police report would still support a

finding of probable cause for the crime of aggravated assault on a police officer.

Therefore, Defendant Ortiz will be granted summary judgment on the § 1983 malicious

prosecution claim.

### E.  Plaintiff's Claims Against Defendant Schultz

Defendant Schultz argues that, because he is being sued in his official capacity as

an employee of the City of Albuquerque, and the City is also a defendant in this case,

this official capacity claim must be dismissed as duplicative.  Plaintiff's Response on

this issue demonstrates some confusion on the relationship of "supervisory" liability

under § 1983.

Broadly speaking, there are two types of liability under § 1983 – personal and

municipal.  Personal liability is found where the action or culpable inaction of an

individual official caused the violation of a person's constitutional rights.  Municipal

liability is found where the execution of a municipality's policy or custom, whether by

its lawmakers or its final policymakers, caused the violation of a person's constitutional

rights.  Municipal liability may be based on (1) an express municipal policy, such as an

ordinance, regulation, or policy statement; (2) a "widespread practice that, although not

authorized by written law or express municipal policy, is 'so permanent and well

settled as to constitute a custom or usage' with the force of law"; or (3) the decision of a

person with "final policymaking authority."  *City of St. Louis v. Praprotnik*, 485 U.S. 112,

123 (1988).  The types of municipal policies and practices which may give rise to § 1983 liability include: (a) deliberately indifferent training;[5] (b) deliberately indifferent supervision or discipline;[6] and (c) deliberately indifferent hiring.[7]  In the instant case, it is the second of these categories (indifferent supervision) which is causing the confusion because the actions of a supervisor may also create **personal** liability for that supervisor. As Plaintiff points out, the Tenth Circuit has held that a "plaintiff may … succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  However, as with all suits attempting to establish personal liability under § 1983, this type of personal-supervisory claim is subject to the qualified immunity defense.  *See id*. at 1191-1208.

    In summary, a suit against a supervisor in their individual capacity looks only to the action/inaction of that supervisor and must overcome the defense of qualified immunity.  A suit against a municipality for failure to supervise can look to the failure of one or more supervisors to demonstrate an implicit policy on the part of the

---

[5] *See e.g., City of Canton v. Harris*, 489 U.S. 378, 380 (1989).
[6] *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (10th Cir. 2010).
[7] *See e.g., Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410-11 (1997).

municipality.  Such a claim against a municipality is not subject to the qualified

immunity defense.

In this case, Plaintiff clearly points to the alleged supervisory failures of

Defendant Schultz as a basis for liability.  However, he repeatedly affirms that the

claims are brought against Defendant Schultz in his official capacity.  *See doc. 52*, caption

& ¶ 3; *doc. 98* at 13, 16, 17.   As the Supreme Court explained in *Kentucky v. Graham*,

"[o]fficial-capacity suits… generally represent only another way of pleading an action

against an entity of which an officer is an agent.  As long as the government entity

receives notice and an opportunity to respond, an official-capacity suit is, in all respects

other than name, to be treated as a suit against an entity."  473 U.S. 159, 165-66 (1985)

(citations and quotations omitted).  Consequently, where a plaintiff chooses to sue both

the municipality and municipal official in an official capacity, courts consistently

dismiss the official capacity claim as "duplicative" or "redundant" of the claim against

the municipal entity.  *See, e.g., Starrett v. Wadley,* 876 F.2d 808, 813 (10th Cir. 1989)

(despite presence of official capacity claim, "the appeal effectively is between only two

parties: the County and plaintiff"); *Houston v. Reich,* 932 F.2d 883, 889 (10th Cir. 1991);

*Doe v. Douglas City Sch. Dist.*, 775 F. Supp. 1414, 1416 (D. Colo. 1991) ("redundant"

official capacity claim dismissed); *Jungels v. Pierce,* 825 F.2d 1127 (7th Cir. 1987)

(whenever a complaint names both a municipality and one of its officials sued only in

his official capacity, "there is only one defendant—the City—not two").

34

Plaintiff brings two claims against Defendant Schultz: battery under state law (Count I), and supervisory liability under § 1983 (Count VII).  The battery claim of Count I is brought against Defendant Schultz in his official capacity and against Defendant City.  *See doc. 52* (caption & ¶¶ 105-115).  Because these claims are redundant as explained above, the official capacity claim against Defendant Schultz in Count I will be dismissed.  *See Ford v. N.M. Dep't of Public Safety*, 891 P.2d 546, 552 (N.M. Ct. App. 1994) (As with § 1983 liability, under New Mexico law, a suit against an individual in his official capacity is a suit against the municipality.).  The "supervisory liability" claim against Defendant Schultz in Count VII is also brought "in his official capacity only." *Id*. ¶ 3.  For the reasons outlined above, the Court will treat this claim as a suit against Defendant City.  Therefore, as the Count VII allegations are incorporated into Count VIII (*see id*. ¶ 172) which *inter alia* makes a claim of municipal liability against Defendant City on the basis of failure to properly supervise, Count VII is redundant and will be dismissed.  Because no claims against Defendant Schultz remain, he will be dismissed from this action.

### F.    <u>Plaintiff's Municipal Liability Claim (Counts VII & VIII)</u>

Reading Plaintiff's Counts VII and VIII together, Plaintiff alleges that Defendant City is liable for Plaintiff's injuries because it was the policy and/or custom of Defendant City to (1) perform inadequate background checks prior to hiring its police officers; (2) inadequately train and supervise its police officers; (3) fail to promulgate

appropriate policies regarding the interactions of subordinate officers with the public;
(4) fail to appropriately monitor the compliance of subordinate officers with department
policies; and (5) fail to investigate instances of noncompliance with policies and
complaints of officer misconduct by the public.  According to Plaintiff, these policies or
customs caused his constitutional rights to be violated.  *Doc. 52* ¶¶ 166-179.  Defendants
argue that there are no such policies or customs, and Plaintiff's claim therefore fails as a
matter of law.  *Doc. 86* at 14.

As laid out above, municipal liability may be based on (1) an express municipal
policy, such as an ordinance, regulation, or policy statement; (2) a "widespread practice
that, although not authorized by written law or express municipal policy, is 'so
permanent and well settled as to constitute a custom or usage' with the force of law"; or
(3) the decision of a person with "final policymaking authority."  *Praprotnik*, 485 U.S. at
123.  In addition, Plaintiff must demonstrate that the enforcement of a municipal policy
or custom was "the moving force" behind the violation of federally protected rights.
*Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997); *see also City of Canton*, 489
U.S. 378, 385 (1989) (there must be "a direct causal link between a municipal policy or
custom and the alleged constitutional deprivation").

### 1.    Inadequate Hiring

In *Brown*, the Supreme Court cautioned:

Where a plaintiff presents a § 1983 claim premised upon the inadequacy of
an official's review of a prospective applicant's record, however, there is a

> particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense: But for the municipality's decision to hire the employee, the plaintiff would not have suffered the injury. To prevent municipal liability for a hiring decision from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

520 U.S. at 410.

Defendants succinctly address the inadequate hiring argument in their briefing, attaching a single page outlining the hiring policies of the APD.  *See doc. 86*, Ex. D.  This undated document states that the selection process for APD officer candidates includes conducting a background check and polygraph examination, as well as requiring that candidates have no felony, domestic violence, or DWI convictions.  *Id.*  Defendants affirmatively state that "these officers [Defendants Kelly and Jara] went through the selection process outlined in Exhibit D."  *Id.* at 20.  Plaintiff essentially abandons this argument, failing to address it in his responsive briefing other than to confirm the validity of Defendants' exhibit.  *Doc. 98* at 14.  In light of this fact, the Court cannot find that there is a sufficient link between any decision on hiring made by Defendant City vis-à-vis Defendants Jara and Kelly, and Plaintiff's injury.  Defendant City is granted summary judgment on this claim.

2.      **Failure to Train**

Plaintiff contends that Defendant City failed to adequately train its police officers as to: (i) the use of force, including deadly force against individuals, (ii) the appropriate management of mentally ill individuals, and (iii) the appropriate use of handcuffs during arrest.  He contends that this inadequate training directly led to the alleged violations of Plaintiff's constitutional rights.  Because the Court has determined that the use of handcuffs was not excessive, the Court will only address Plaintiff's failure to train argument as it applies to the APD's use of force and interactions with the mentally ill.

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983." *Canton*, 489 U.S. at 387.  "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id*. at 388.  In other words, the plaintiff must show that "the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights," as to amount to a municipal policy of deliberate indifference to citizens' constitutional rights.  *Id*. at 390.  However, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91 (citations omitted).  Consequently, a

plaintiff must also establish "a direct causal link between the constitutional deprivation and the inadequate training." *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (citing *Allen v. Muskogee*, 119 F.3d 837, 841–842 (10th Cir. 1997)).

A review of the evidence presented by Defendant City shows that the APD has a Standing Operating Procedures Manual that provides guidance on the use of force, including the use of deadly force and the limitations on the use of deadly force by its officers. *Doc. 86*, Exs. B, C.  Further, according to APD policy, all uses of force resulting in death or seriously bodily injury must be reported and investigated. *Id.,* Ex C.  Officer training included instruction in dealing with mentally ill individuals, specifically to attempt to de-escalate confrontational situations and to use force as a last resort. *Doc. 98*, Ex. 9 ¶¶ 18-25.  Both Defendants Jara and Kelly received training in the use of force, including deadly force, and in crisis management. *Doc. 86*, Exs. G, H.

At no single place in his Response does Plaintiff marshal his arguments with respect to the failure to train claim.  Plucking all possibly relevant facts and arguments from the various places they appear, the Court finds that Plaintiff relies on the following to make out this claim: (1) the unusually large number of APD shootings between 2006 and 2010; (2) four recommendations from the PERF report; (3) the assertion that, after 2007, APD no longer offered a 40-hour crisis intervention team (CIT) course to all officers; and (4) the opinions of plaintiff's expert, Mr. Clark.  Even viewed together with all inferences made in Plaintiff's favor, these facts are insufficient to

establish a genuine dispute of material fact as to this claim.  Specifically, Plaintiff fails to

present evidence by which a reasonable jury could find either deliberate indifference on

the part of Defendant City or that the allegedly inadequate training caused the allegedly

unconstitutional use of deadly force by Defendant Kelly.

Plaintiff's argument based on the sobering number of APD shootings is, at first

glance, persuasive.  Plaintiff points to the undisputed facts that, between 2006-2010,

there were 62 shootings, 35 of which were fatal, and many of these shootings involved

mentally ill individuals.  *Doc. 98* at 3.  The very fact of these shootings, according to

Plaintiff, indicates that APD officers were not properly trained in the use of force, at

least in the context of dealing with mentally ill individuals.  However, Plaintiff fails to

demonstrate that a significant number of these shootings were unconstitutional, let

alone that they were caused by deliberately indifferent training.  In fact, of all the

shootings described by Plaintiff, only one was identified by a competent authority as

excessive.[8]  *Doc. 98* at 8.  Defendant City has set forth undisputed evidence that, rather

than ignoring these incidents, it investigated each of the shootings at issue and that it

found those uses of force justified.  *See doc. 98*, Ex. 5; *doc. 99*, Ex. 16.  Perhaps if Plaintiff

presented evidence of a pattern of inadequate investigations, he would be entitled to an

inference that far more of the shootings were examples of excessive force.  *See Schneider*

*v. City of Grand Junction Police Dept.*, 717 F.3d 760, 776 (10th Cir. 2013) (explaining that a

---

[8] Also, Plaintiff has not set forth evidence showing in that incident that a mentally ill individual was involved such that the use of force resulted from inadequate training in dealing with the mentally ill.

40

police internal investigation is not inadequate and indicative of deliberate indifference simply because the plaintiff disagrees with the conclusion reached by the investigators). However, beyond pointing to the one case on which a state district judge disagreed with APD's finding that the shooting was justified, Plaintiff presents no such evidence. Standing alone, that single case does not support the proposition that APD deadly-force investigations were inadequate such that an adverse inference would be justified.

The PERF report did make several references to areas in which training could be improved.  Plaintiff points out the following PERF recommendations:  (1) "additional instruction in de-escalation techniques should be presented to officers at the entry level and at in-service training;"[9] (2) "APD should stress in its training for patrol and dispatch the importance of the prompt arrival of a supervisor at critical situations, noting this can be a 'much stabilizing event' that can help to 'slow things down'";[10] (3) APD's Use of Force training can be improved upon insofar as the training models utilized at that time by APD 'tend to over-step their usefulness by suggesting to officers that a specific action by a person justifies specific reaction(s) by the officer.  In reality, the often instantaneous – yet objectively reasonable - decision that must be arrived at by the officer should stem from processing of the information known to the officer, rather than recall from a memorized matrix'";[11] (4) "expand C.I.T. training and the frequency

---

[9] *Doc. 98* at 5 (*citing* Ex. 2, p. 83).
[10] *Id*. at 6 (*citing* Ex. 2, p. 23).
[11] *Id*. at 8 (*citing* Ex. 2, p. 79) (emphasis omitted).

of in-service training in dealing with people with mental illness."[12]  Plaintiff contends

simply that the fact of these recommendations "suggest[] deficiencies in APD's training

on these issues." *Id*. at 11.  Certainly these recommendations indicate that APD's

training could be improved.  However, these relatively modest recommendations fail to

demonstrate that the City's prior training had been so utterly inadequate training to

show reckless indifference to citizen's constitutional rights.  In fact, the PERF overview

states that the "Albuquerque Police Department (APD) has taken many positive steps in

response to the spate of officer-involved shootings it has experienced in recent years.

Officers are trained at the entry level and are regularly retrained in tactics to de-escalate

volatile incidents and in measures to control persons, when possible, before the use of

greater force is necessary. At the time of the PERF visit, training staff were assessing

training strategies with a goal of including greater roleplay exercises that call on officers

to consider a wide range of options to calm situations, rather than to permitting them to

escalate." *Id*., Ex. 2 at 3.  Moreover, as the Tenth Circuit has recognized, post-incident

expert testimony as to how the training the officers received was inadequate "merely

demonstrate[s] the omniscience of hindsight." *Carr v. Castle*, 337 F.3d 1221, 1230 (10th

Cir. 2003).  Finally, of course, the PERF recommendations do not aid Plaintiff in

establishing causation.

---

[12] *Id*. at 11 (*citing* Ex. 2, p. 83-84).

Plaintiff next cites the Grover affidavit to establish that, after 2007, APD no longer offered a 40-hour crisis intervention team (CIT) course to all officers every year. *Doc. 98* at 6 (*citing* Ex. 9). Even assuming this isolated fact is true, without being placed within the context of the complete training program of APD, it establishes neither deliberate indifference nor causation.[13]

Finally, Plaintiff points to its police procedures expert's opinions. *Id*. at 13. Unfortunately, the opinions contained in Mr. Clark's report provide no meaningful support to Plaintiff's failure to train claim. At no point does Mr. Clark opine that the APD training was inadequate, let alone sufficiently inadequate to demonstrate deliberate indifference. *See generally, doc. 98*, Ex. 20. Mr. Clark talks generally about how "officers" are trained, but it is unclear whether he is referring to some amorphous national standard or how APD officers were actually trained. *See e.g., id.* at 8-12. In fact, one could infer that Mr. Clark concluded that Defendant Kelly was reasonably trained as he repeatedly uses the phrase "any reasonably trained officer (including Officer Kelly)." *See e.g., id*. at 9, 10. It appears that Mr. Clark's opinion is not that the APD training was inadequate, but that the officers did not follow it. *See id*. at 11 ("A key aspect of this incident was the failure of the APD Officers to follow the standards and training regarding officer contacts with subjects who have a mental illness.").

---

[13] This is particularly true here where it appears that Defendant Kelly received 43-hours of "crisis management" training. *Doc. 86*, Ex. 8 at 7.

In conclusion, the facts presented by Plaintiff and reasonable inferences

therefrom are insufficient to establish a genuine dispute of material fact as to the claim

that Defendant City is liable pursuant to § 1983 for failure to train Defendant Kelly.

### 3. Failure to implement, failure to investigate, and ratification claims

In his Complaint, Plaintiff argues that either Defendant City failed to promulgate

appropriate policies to subordinate officers for dealing with the public or, in the

alternative, did institute appropriate policies but failed to enforce them with regard to

the conduct of subordinate officers, including Defendants Jara and Kelly. *Doc. 52* ¶ 167.

Plaintiff does not, either in his Complaint or responsive briefing, cite to any specific

policies that are facially appropriate but unconstitutionally applied. *See City of Canton*,

489 U.S. at 386; *Meyers v. Okla. Cty. Bd. of Comm'rs*, 151 F.3d 1313, 1319 (10th Cir. 1998).

But, in his responsive briefing to Defendant City's motion, Plaintiff states that

Defendant City's *failure* to enact appropriate policies and failure to investigate uses of

force led to a widespread officer custom of using "an unreasonable . . . amount of force

during encounters with citizens." *Doc. 98* at 18.  The Court will therefore analyze this

claim.  In addition, Plaintiff argues that Defendant City ratified Defendants Jara and

Kelly's unconstitutional conduct by justifying the shooting of Plaintiff to the media and

by failing to investigate incidences of officer misconduct. *Id.* at 19-20.

Plaintiff is essentially arguing that Defendant City's inaction (by failing to halt or

correct the alleged widespread officer custom of using excessive force) is the source of

its liability for the violation of Plaintiff's constitutional rights.  While this argument does have considerable overlap with Plaintiff's failure-to-train argument, it is conceivable that, even if Defendants Jara and Kelly did receive proper training, that the APD still has a widespread custom of permitting the use of excessive force, particularly with regard to mentally ill citizens.

Plaintiff, however, fails to set forth evidence that Defendant City has a custom of condoning the use of excessive force.  As evidence of this custom, as with his inadequate training argument, Plaintiff points to the number of shootings by APD officers, again disregarding that only one out of sixty-two incidents was found to be excessive. *See Bell v. City of Topeka, Kan.*, 496 F. Supp. 2d 1182, 1190 (D. Kan. 2007) (plaintiff failed to demonstrate a custom of condoning excessive force where he failed to produce evidence of other incidents of excessive force).

In fact, the evidence produced by Plaintiff indicates that Defendant City was actively trying to address the APD's use of force, not ignore or condone it.  As Plaintiff himself points out, in the summer of 2010 and prior to his shooting, Defendant Schultz "suggested to the City that it engage the "PERF" to analyze the rising numbers of shootings and APD's policies and procedures." *Doc. 98* at 4, Ex. 7 at 118:1-11.  And in fact, Defendant City did engage PERF. *Id.*  As the PERF report explained: "The City of Albuquerque and the Albuquerque Police Department (APD) have in place a wide array of mechanisms designed to manage officers' use of force and to monitor and

45

investigate officer-involved shootings. The department has reassessed its training and has adopted a greater focus on tactics to resolve conflicts without force whenever possible." *Id.*, Ex. 2 at 2. Even prior to the shooting, the APD had in place an Internal Affairs Unit and "Early Warning System" (EWS), which were devoted to monitoring and correcting the use of force by APD officers. *Doc. 86*, Exs. M, N; *doc. 98* at 14-15, Ex. 5; *doc. 99*, Ex. 1 at 143:1-13, 17-19.[14]

Plaintiff insists that regardless of the existence of these policies and practices, the true custom of the APD is revealed by the APD's failure to discipline and affirmative ratification of the conduct of Defendant Kelly. *See doc. 98*, Exs. 9 at 6, 20 at 10. This argument leads directly into Plaintiff's failure to investigate claim, which is part and parcel of the APD's alleged failure to appropriately punish Defendant Kelly.

First, the Court notes that it is undisputed that the APD investigated Plaintiff's shooting, and the fact that the APD investigated this incident itself cuts against the proposition that it condoned any alleged use of excessive force. *Doc. 99*, Ex. 1 at 16:14-17, Ex. 17; *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 852 (5th Cir. 2009). Second, Plaintiff's argument might have some weight if Plaintiff had produced evidence of a pattern of not disciplining officers who used what the APD determined to be an unreasonable use of force. But Plaintiff has cited to no specific instances of an officer

---

[14] Plaintiff does not dispute the existence of the EWS at APD, but does dispute its effectiveness. *Doc. 98* at 14-15. However, Plaintiff does not contend that the EWS was a sham or otherwise ignored. As with the other recommendations from PERF, the fact that PERF recommended that triggering number be lowered from 5 to 3 cannot support the claim that the City had previously been recklessly indifferent.

shooting or other use other force that the APD has failed to investigate.   *Cf. Ortega v.*

*City and Cty. of Denver*, 944 F. Supp. 2d 1033, 1039-40 (D. Colo. 2013) (holding that

plaintiff met its burden of demonstrating a custom of condoning excessive force where

plaintiff produced evidence of, *inter alia*, "specific instances in which [the police

department] has failed to adequately investigate a citizen complaint of excessive force

and the implicated officer was not disciplined").   Instead, Plaintiff has produced

evidence of the contrary: not only does the APD investigate instances of uses of force on

its own volition, but where an APD investigation has revealed an inappropriate use of

force or violated some other APD policy or protocol, officers have been disciplined or

terminated.  *Doc. 98*, Ex. 5, 9 at 6-7; *doc. 99*, Ex 1 at 99:10-19, 100:6-25, 101:1-8, 189:17-21,

198:14-23, Exs. 17-18.   Nor has Plaintiff introduced any evidence to show that the

investigation into Defendant Kelly's conduct specifically was inadequate[15] – Plaintiff

merely disagrees with the results.

       Finally, Plaintiff contends Chief Schultz ratified Defendant Kelly's conduct in the

following ways: by making a statement to the press the day after the shooting that "You

can't rationalize with them [people acting irrationally], and if you do get to the point

where you are using a less lethal force option, it's not effective" and by concurring with

---

[15] The Court does note Mr. Grover's affidavit, which states that he, a fellow police officer on the scene, observed "many issues of misconduct on the part of Defendant Kelly" which can be summarized as two: that Defendant Kelly shot Plaintiff as a result of her failure to follow SOPs and immediately afterwards, smoked a cigar at the scene.  *Doc. 98*, Ex. 9 ¶ 28.  His observations, however, do not prove that the investigation into Defendant Kelly's conduct was inadequate, just that he believes it should have reached a difference conclusion.  Moreover, it is axiomatic that the failure to investigate or discipline Defendant Kelly for her actions on September 14, 2010 could not have caused her actions on that date.

the Police Oversight Commission finding that Detective Kelly used justifiable force when she shot Plaintiff. *Doc. 98* at 7; *doc. 99* at 131:18-132:3. "However, a municipality will not be found liable under a ratification theory unless a final decision maker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010). First, at best, Chief Schultz's statement to the media is equivocal, stating that he could see a basis for the shooting – it falls far short of a specific ratification that (1) the force used by Defendant Kelly was excessive, and (2) it was proper for Defendant Kelly to use excessive force. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1987) (referring to ratification as accomplished when "a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker"). Further, the fact that Chief Schultz then ordered an investigation into the shooting undermines the proposition that his statement constituted ratification. More significantly, ratification in this context provides a basis for liability only where the official "deci[des] to ratify unconstitutional conduct." *Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1102 (D. Mont. 2009); see also *Waters v. City of Chicago*, 580 F.3d 575, 585 (7th Cir. 2009) (ratification theory of liability "require[s] proof that the policymaker approved of the unconstitutional motive"); *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 451 (4th Cir. 2004) (municipality not liable on ratification theory for upholding termination in

grievance process because it did not aware of the alleged retaliatory motive for the termination).

In the instant case, Chief Schultz would be liable on a ratification theory only if he knew or believed that the shooting was excessive force and still he approved of it. Instead, the Police Oversight Committee found that the shooting was justified. As such, his concurrence therewith cannot constitute ratification of unconstitutional conduct.

Because Plaintiff has failed to present evidence to create a genuine issue of material fact as to his claims against the City for failure to implement or investigate, or on a ratification theory, Defendant City is entitled to summary judgment on them.

## VI.   PLAINTIFF'S STATE LAW CLAIMS

In addition to his federal claims, Plaintiff brings state tort claims for battery (against Defendants City, Jara and Kelly),[16] false arrest (against Defendants City and Ortiz), and malicious prosecution (against Defendants City, Kelly, and Ortiz). Defendants respond that, as to Defendants City and Schultz, Plaintiff never filed a tort claim notice as required under New Mexico law, and these claims should be dismissed on that basis. *Doc. 86* at 17. In the alternative, they contend that governmental immunity is not waived for these claims. *Id.* at 18-19. Defendants Jara, Kelly, and Ortiz argue that they are also immune because Plaintiff has failed to prove at least one the

---

[16] Plaintiff also included Defendant Schultz in his claim of battery. However, as discussed above, the claim against him is brought in his official capacity, and, as such, will be dismissed as redundant. *See supra* at 32-36.

essential elements of each of his claims.  *Doc. 59* at 22-24, *doc. 64* at 21-23.  Defendant

Ortiz also asserts that any claims against her are time-barred.  *Doc. 59* at 19.

A.    **Plaintiff's Battery Claim**

1.    **Defendants Kelly and Jara**

A reading of Plaintiff's complaint indicated that Plaintiff contends that

Defendants Kelly is liable for battery for shooting Plaintiff and Defendant Jara is liable

for battery for handcuffing him after he was shot.  *Doc. 52* at 14.  Defendants Kelly and

Jara respond first that they have immunity from this tort because they used a

reasonable and lawful amount of force in effecting Plaintiff's arrest.  *Doc. 64* at 22.

Under New Mexico law, a police officer may be liable for negligence that results

in a specifically enumerated tort under the NMTCA, including battery. NMSA 1978 §

41-4-12; *Caillouette v. Hercules, Inc.*, 827 P.2d 1306, 1311 (N.M. Ct. App.  1992).  "[A] claim

arising out of one of the common-law torts enumerated within the Section 41-4-12

waiver of immunity is essentially a common-law negligence claim, and the plaintiff

need only show a violation of a common-law duty."  *Weinstein v. City of Santa Fe ex rel.*

*Santa Fe Police Dept.*, 916 P.2d 1313, 1319 (N.M. Ct. App. 1996) (citing *Blea v. City of*

*Espanola*, 870 P.2d 755, 758-59 (N.M. Ct. App. 1994)).

A person is subject to civil liability for battery if " 'he [or she] acts intending to

cause a harmful or offensive contact with the person of the other or a third person, or an

imminent apprehension of such a contact, and . . . an offensive contact with the person

50

of the other directly or indirectly results.' " *State v. Ortega*, 827 P.2d 152, 155 (N.M. Ct. App. 1992). A police officer will not be liable for battery so long as he acted in good faith and only used the force reasonably necessary under the circumstances. *See Jonas v. Bd. of Comm'rs of Luna Cty.*, 699 F. Supp. 2d 1284, 1297 (D.N.M. 2010) (citing *State v. Gonzales*, 642 P.2d 210, 213 (N.M. Ct. App. 1982)). Defendant Kelly, for her part, does not dispute that she intended to shoot, and therefore commit battery against Plaintiff. Instead, she argues that she only used reasonably necessary force. Likewise, Defendant Jara contends she used reasonable force in handcuffing Plaintiff.

As to the shooting, for the reasons discussed in Section V.B.1, there is a material factual dispute that precludes a finding of reasonableness for Defendant Kelly. Based on the undisputed evidence, the handcuffing, for the reasons discussed in Section V.B.3, was a reasonable use of force.

Therefore, Defendant Kelly's motion for summary judgment is denied as to the battery claim relating to the shooting and Defendant Jara's motion is granted as to the battery claim related to the handcuffing.

### 2.   Defendant City

Plaintiff seeks to hold Defendant City liable for the same acts of battery under the theory of *respondeat superior*, and further seeks to hold Defendant City liable for negligent hiring, training, supervision, discipline, and retention. *Doc. 86* at 19. Because

only Plaintiff's battery claim in reference to the shooting survives summary judgment, these Defendants' liability will only be considered with regard to that claim.

### i.    Vicarious liability for the battery

A governmental entity "may be held vicariously liable for any alleged torts committed by the officers for which immunity has been waived [under the NMTCA]." *Weinstein*, 916 P.2d at 1318.  In order for Defendant City to be held liable,  "the city or state [has] to have direct supervisory responsibility or control over the negligent employee responsible for the harm," and the actions of the employees cannot be too far removed from the entity's responsibilities.  *Id.* (citation omitted).

Defendant City does not dispute that it had direct supervisory responsibility or control over Defendant Kelly, nor that it is too remote of an entity to be sued.  Since, as discussed above, there is a material dispute as to whether or not Defendant Kelly committed battery, it is equally possible that a reasonable jury could find Defendant City liable under a *respondeat superior* liability theory for the battery.  The Court will deny Defendant City's motion for summary judgment on that claim.

### ii.    Liability due to negligent training and supervision

Defendant City may also be held liable for negligent training and supervision of Defendants Jara and Kelly, provided that negligent training and supervision was a proximate cause of the battery.  *Ortiz v. N.M. State Police*, 814 P.2d 117, 120 (N.M. Ct. App. 1991); *McDermitt v. Corr. Corp. of America*, 814 P.2d 115, 116 (N.M. Ct. App. 1991).

For the reasons discussed in Section V.G.2, Plaintiff has failed to present evidence creating a genuine dispute of material fact as to whether Defendant City was negligent in either its training or supervision of Defendants Jara and Kelly.  The Court will grant Defendant City summary judgment on these claims.

### iii.    Liability for negligent hiring, discipline and retention

Unlike negligent hiring and supervision, Plaintiff has not cited, nor has the Court located, case law in New Mexico finding a waiver of sovereign immunity within the NMTCA for a claim of negligent hiring, discipline, or retention.  That said, even assuming for the sake of argument that such a claim could proceed, this Court concludes that a plaintiff would be required to show that the negligent hiring, discipline and/or retention was the proximate cause of the alleged battery.  For the reasons discussed in Section V.G.1 & 3, Plaintiff has failed to present evidence creating a genuine dispute of material fact on that issue.  Therefore, the Court will grant Defendant City summary judgment on these claims.

### B.    Plaintiff's False Arrest Claim

The NMTCA also specifically waives immunity for law enforcement officers sued for false imprisonment or false arrest. N.M. Stat. § 41-4-12.  "The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dep't of Pub. Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007).  "A false arrest is merely

one way of committing false imprisonment." *Id.*  An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest.  *See State v. Johnson*, 930 P.2d 1148, 1154 (1996).

Under New Mexico law, law enforcement officers have probable cause to arrest a person "when the facts and circumstances within the officers' knowledge, and of which they had reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been, or is being, committed." *Santillo v. N.M. Dept. of Public Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007).  As under federal law, "[w]hen deliberate misrepresentations or statements resulting from a reckless disregard for the truth are shown to be contained in an affidavit, the challenged material must be set aside and the balance of the affidavit scrutinized to determine whether there remain sufficient other facts to support a finding of probable cause." *State v. Donaldson* 666 P.2d 1258, 1264 (N.M. Ct. App. 1983).  For the reasons discussed above, Defendant Ortiz did have sufficient facts to underpin a finding of probable cause to arrest Plaintiff even with the excision of the disputed facts.  *See supra* at 26-29.  Further, because Defendant Ortiz did not commit the tort of false arrest, Defendant City equally cannot be held liable for it.  Defendants City and Ortiz's Motions for Summary Judgment on this claim are granted.

54

C.   **Plaintiff's Malicious Prosecution Claim**

Plaintiff's final claim is for malicious prosecution/abuse of process.  According to

Plaintiff, Defendants' Kelly and Ortiz's liability for this tort arise from their filing of the

complaint and the pursuit of prosecution against Plaintiff based upon the alleged

misrepresentations about Trujillo's testimony.  However, as discussed above, Plaintiff

fails to point to any actions taken by Defendant Kelly to support this claim against her.

Therefore, the Court will grant summary judgment for Defendant Kelly on this claim.

The NMTCA waives immunity for law enforcement officers sued for this tort.

N.M. Stat. § 41-4-12.  Under New Mexico law, the torts of malicious prosecution and

abuse of process have been combined into a single cause of action for malicious abuse of

process. *Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009).  The elements of this tort are: "(1)

the use of process in a judicial proceeding that would be improper in the regular

prosecution or defense of a claim or charge; (2) a primary motive in the use of process to

accomplish an illegitimate end; and (3) damages."  *Id.*  "An improper use of process

may be shown by (1) filing a complaint without probable cause, or (2) 'an irregularity or

impropriety suggesting extortion, delay, or harassment[,]' or other conduct formerly

actionable under the tort of abuse of process."  *Id.* (citation omitted).

As discussed when analyzing the § 1983 malicious prosecution claim, Plaintiff

has failed to demonstrate that the complaint lacked probable cause even if one were to

excise the disputed facts surrounding Mr. Trujillo's interview.  Thus, Plaintiff can only

55

proceed on his state claim under the second method of establishing "improper use of process."  Indeed, Plaintiff, by pointing to the alleged misrepresentations by Defendant Ortiz supposedly motivated by a desire to foreclose his civil claim, arguably presents a colorable state claim.  However, Defendant Ortiz argues that this claim is time-barred.  This Court agrees.

"The statute of limitations applicable to a cause of action under Section 41-4-12 is set forth in Section 41-4-15, N.M.S.A. 1978.  Under Section 41-4-15, the action must be commenced within two years after the occurrence which results in the injury."  *DeVargas v. State ex rel. N.M. Dept. of Corr.,* 642 P.2d 166, 166 (1982).  As Defendant Ortiz argues, all the actions alleged to constitute this tort occurred no later than the date of Plaintiff's arraignment on the grand jury indictment on November 22, 2010.  Plaintiff did not file this claim against Defendant Ortiz until July 3, 2013, well outside the two-year statute of limitation.  *Doc. 59* at 20.

Plaintiff concedes that his claim appears to be barred, but is in fact saved either by the discovery rule or equitable tolling.  Under the discovery rule, the accrual of a cause of action is delayed until a plaintiff discovers or with reasonable diligence should have discovered that a claim exists. *See Roberts v. Southwest Cmty. Health Servs.,* 837 P.2d 442, 449 (N.M. Ct. App. 1992).  According to Plaintiff, his cause of action did not accrue until June 10, 2013, when Mr. Trujillo revealed Defendant Ortiz's misrepresentation of his interview on September 14, 2010.  *Doc. 74* at 22.  While Plaintiff may not have

actually discovered the alleged misrepresentations until that date, he fails to show that,

with reasonable diligence, he could not have discovered them earlier.

"When a defendant makes a *prima facie* showing that a claim is time barred, a

plaintiff attempting to invoke the discovery rule has the burden of demonstrat[ing] that

if [he or] she had diligently investigated the problem [he or] she would have been

unable to discover the facts underlying the claim." *Martinez .v Showa Denko, K.K.*, 964

P.2d 176, 181 (N.M. Ct. App. 1998). "The standard of reasonable diligence imports an

analysis of objectivity." *Williams v. Stewart*, 112 P.3d 281, 285 (N.M. Ct. App. 2005).

Here, counsel for Plaintiff in the instant action also served as counsel for Plaintiff in the

preceding criminal action. *Doc. 59*, Ex. F. Thus, counsel for Plaintiff would have

received all materials associated with the criminal charge of aggravated assault on an

officer. Consequently, counsel would have been given the criminal complaint soon

after his arraignment as well as discovery materials such as Defendant Ortiz's police

report. *See* NMRA Rule 5-501. These are the documents containing the Defendant

Ortiz' s alleged misrepresentations of Mr. Trujillo's interview. Further, Plaintiff was

entitled to a copy of the recording of Defendant Ortiz's grand jury testimony at any

time after his indictment. *See* NMRA Rule 5-506(c). Plaintiff has not asserted that there

was any failure by the prosecution to provide his counsel with this discovery, nor that

he was prevented from requesting the grand jury testimony.

A review of these materials shows that in the arrest warrant affidavit, Defendant

Ortiz substantially relied on two witnesses to the incident to substantiate probable cause: Defendant Kelly, and Ryan Trujillo, who is specifically identified in the affidavit. Further, in her grand jury testimony, Defendant Ortiz testified at length about what Mr. Trujillo told her about the events at issue, again specifically naming Mr. Trujillo. Therefore, as soon as Plaintiff received the criminal discovery in this action, which would have, at the latest, been in early December 2010, Plaintiff would have been on notice that Mr. Trujillo's account of events was central to the prosecution of the charge against him.  And, of course, Plaintiff would have known that, by his account of events, Mr. Trujillo's statements, as presented by Defendant Ortiz, were inaccurate.  Reasonable diligence would have demanded that Plaintiff interview Mr. Trujillo.  Such an interview would have revealed the discrepancies on which Plaintiff now rests his malicious prosecution/abuse of process claim.  The Court recognizes that, even with reasonable diligence, it may have taken some time to accomplish such an interview.  However, given that Plaintiff's claim against Defendant Ortiz was filed more than seven months after all events causing the injury had occurred, Plaintiff's claim would only be timely under the discovery rule if the Court were to conclude that the interview could not have reasonably occurred for more than seven months.  This the Court cannot do.  Because Plaintiff has failed to show reasonable diligence, Plaintiff's cause of action cannot be saved by the discovery rule.

Nor is Plaintiff's action saved by equitable tolling.   Under New Mexico law,

equitable tolling only applies where "a litigant was prevented from filing suit because of an extraordinary event beyond his or her control." *Slusser v. Vantage Builders, Inc.*, 306 P.2d 524, 530 (N.M. Ct. App. 2013)(citation and quotation omitted).  Similarly to plaintiffs seeking to invoke the discovery rule, a plaintiff invoking the protection of equitable tolling bears the burden of demonstrating that he has pursued his rights diligently, and that some extraordinary circumstance frustrated his abilities to do so.  *Id.* at 531.  Here, Plaintiff fails to point to any extraordinary circumstance that would have prevented him from discovering Defendant Ortiz's misrepresentations in her arrest warrant affidavit and grand jury testimony.

Because neither the discovery rule nor equitable tolling are applicable to Plaintiff's state cause of action against Defendant Ortiz, it must be dismissed as time-barred.  Further, because the claim against Defendant Ortiz is dismissed, the same claim against Defendant City on a *respondeat superior* theory is also dismissed.

## VII.   Plaintiff's Motion Under 56(d) is Denied

Plaintiff requests the Court's permission to depose individuals in support of the malice and favorable termination elements of Plaintiff's malicious prosecution claims. *Doc. 74* at 29, Exs. 21, 22.  Rule 56(d) allows a party to obtain limited discovery "of facts essential to justify its opposition" to a motion for summary judgment "when facts are unavailable to the nonmovant." FED. R. CIV. P. 56(d).  As discussed above, Plaintiff's federal malicious prosecution claim fails because of the presence of probable cause.

Plaintiff's state malicious prosecution claim fails due to statute of limitations. Therefore, the requested discovery is not essential to the Court's ruling on the motion for summary judgment and will be denied.[17]

## VIII. CONCLUSION

For the forgoing reasons, Defendant Ortiz's Motion for Summary Judgment is GRANTED and she is dismissed from this action. Defendants Jara and Kelly's Motion for Summary Judgment is GRANTED in part and DENIED in part and Defendant Jara is dismissed from this action. Defendants City and Schultz's Motion is GRANTED in part and DENIED in part, and Defendant Schultz is dismissed from this action. All Plaintiff's claims are dismissed with prejudice except for the § 1983 claim against Defendant Kelly for excessive force, the state battery claim against Defendant Kelly, and the state battery claim against Defendant City on the theory of respondeat superior.

**IT IS SO ORDERED.**

_____ E JUDGE

**Presiding by Consent**

---

[17] Nothing in this ruling should be construed as rendering an opinion about appropriate discovery going forward now that the stay will be lifted.